

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| TAMELA A. MILLS,<br><br>                    *Plaintiff,*<br><br>v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security<br><br>                    *Defendant.* | CIVIL ACTION NO. 3:05CV00016<br><br><br>MEMORANDUM OPINION<br><br><br><br>JUDGE NORMAN K. MOON |

This matter comes before the Court on appeal from the final decision of the Commissioner, which denied the Plaintiff's April 7, 2000 claim for a period of disability, disability insurance, and supplemental security income benefits under the Social Security Act (Act), as amended, 42 U.S.C. §§ 416, 423, and 1381 *et seq*. The Plaintiff appealed the Commissioner's denial of disability benefits, filing a complaint with this Court on March 23, 2005. This matter was referred to United States Magistrate Judge B. Waugh Crigler for proposed findings of fact, conclusions of law, and a recommended disposition. *See* 28 U.S.C. § 636(b)(1)(B). Both the Plaintiff and the Commissioner filed motions for summary judgment. In his Report and Recommendation of October 7, 2005, the Magistrate recommended that this Court reverse the Commissioner's final decision, granting judgment to the Plaintiff, and recommitting the case for the sole purpose of calculating and paying proper benefits. The

1

Commissioner has filed timely objections to the R&R, making this case ripe for determination.

**I. Facts**

The Plaintiff, Tamela A. Mills, is a 43 year old mother of one who filed for Social Security disability benefits on April 7, 2000, claiming that she was unable to work due to depression and severe pain associated with a peripheral neuropathy. Up until mid-1998, the Plaintiff had worked for fifteen years primarily as a licensed practical nurse in a variety of settings. She also worked part-time as a nurse in 1998 but quit due to worsening pain.

The Plaintiff's medical record indicates that she suffers from a peripheral neuropathy primarily affecting her right leg. Many of her primary care providers believe that this neuropathy developed as a result of chemotherapy received for breast cancer in 1993. Since then, the Plaintiff has been continually treated for pain related to this neuropathy. On January 25, 1996, Donald B. Schmidt, M.D., described having treated the Plaintiff for throbbing leg pain and noted his impression that she suffered chronic neuropathic pain in her right leg. The Plaintiff continued receiving treatment for her leg pain in 1996, which included a regimen of Imipramine, Ultram, and Neurontin. A nerve block was also performed on June 13, 1996. (R 320, 319). In July 1997, Sayeed Kahn, M.D., diagnosed a right sural nerve neuropathy, with levels of pain generally being stable with medication. (R. 305). The Plaintiff's treatment continued throughout 1997 and 1998, during which time she reported fluctuating levels of pain and functioning. She reported some improvement in her leg on March 4, 1999 and received an increase in her prescription of Gabapentin in December 1999 as a result of swelling in her ankles.

In April 2000, the Plaintiff reported that the pain in her right leg was increasing and on June 2, 2000 she had an initial visit with Geoffrey S. Hawboldt, M.D., at the Department of

2

Anesthesiology in the Pain Management Center. He recommended that the Plaintiff begin taking Topiramate and noted his impression that she suffered a neuropathic pain in the lower right leg. (R. 256). In August 2000, R.S. Kadian, M.D., noted in an RFC assessment that the Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for about six hours in an eight hour workday, sit for about six hours, and push and pull with no limitations.

On November 30, 2000, the Plaintiff saw William Barrish, M.D., the Commissioner's examining medical expert. (R. 324). Dr. Barrish noted that her complaints of pain were consistent with a neuropathy and that her chemotherapy treatment was consistent with this. He also reported that he felt that "she would have difficulty with job-related activities that would involve prolonged standing, walking, or repetitive carrying or lifting." However, he did not see "any functional limitations that would prevent her from performing light duty or sedentary activity." Finally, he noted that this would be "especially facilitated by a job which would allow her to elevate her foot occasionally to reduce the amount of edema and swelling."

On April 23, 2001, the Plaintiff saw Dr. Plews-Ogan for treatment of swelling, pain, and numbness in her legs, right ankle, and back. Dr. Plews-Ogan noted her impression that the Plaintiff suffered from a bilateral lower extremity neuropathy. (R. 364). The Plaintiff continued seeing Dr. Plews-Ogan, with her condition varying from better to worse. On March 12, 2002, Dr. Plews-Ogan stated that the Plaintiff "has a medical condition which could reasonably cause her to need to elevate her feet, and particularly her right foot, at least to waist level periodically through the day to alleviate swelling in her lower extremity." (R. 433). On November 7, 2002, the Plaintiff reported increased pain in her right leg after trying to do more work and activities around the house. (R. 449). In response, the Plaintiff's prescription of Methadone was increased

3

and she was also prescribed Oxycodone for breakthrough pain. (R. 449).

On February 4, 2003, Jennifer E. Bishop, M.D., a resident physician working under Dr. Plews-Ogan, noted in a letter to the local Social Services office that the Plaintiff felt she could not tolerate eight hours a day in a classroom without causing her pain to worsen. (R. 507). Dr. Bishop stated that she had "no way of knowing how well she will tolerate the training" and related that she had told the Plaintiff that she thought "it would be reasonable to initially try a reduced schedule and then build up to full time relatively quickly if she tolerates it." (R. 507). Dr. Bishop also attached to the letter a medical evaluation in which she indicated that the Plaintiff "needs to keep leg elevated," cannot stand for long periods, and can drive for short periods only. (R. 508). The evaluation also noted that she "may not be able to tolerate full-time employment" and that "it is unknown if she will regain ability to work standing or sitting normally." (R. 509).

The Plaintiff describes her ailment as pain and swelling in her lower leg and tesitifed that she needs to lie down and prop up her legs in order to find relief. (R. 551-552). She also testified that at the end of a four-hour work period at her part-time job she would be tired and "hurting pretty well." (R. 576). After returning from work, she would take a nap for a couple of hours or at least lie in bed with her leg propped up. (R. 577). She also testified that her leg swells and begins to get painful if she sits with her foot on the floor and that usually the only thing that helps is to lie down in bed and keep her leg propped up above heart level. (R. 579).

With regard to the Plaintiff's depression, she was treated by Paul C. Wilkins, M.D., for depression subsequent to having a mastectomy performed, but ended treatment in 1999 when her condition improved. Her mental health, however, began to deteriorate in 2000 and 2001 and she

4

reported increasingly paranoid and delusional thoughts. She went to the emergency room on March 2, 2001 and was admitted to inpatient care that same day. Subsequent to being discharged from inpatient care on March 8, 2001, the Plaintiff began seeing David F. Silver, M.D., who treated her through December 2001. On March 22, 2001, Dr. Silver noted in a Psychiatric Evaluation report that the "UVA diagnosis of recurrent major depression appears accurate." (R. 420). From May 2001 through October 2001, Dr. Silver reported that the Plaintiff was generally doing better, although he noted in October that she perhaps had a mildly depressed affect. (R. 411- 414). In December 2001, the Plaintiff reported doing "real well" and Dr. Silver noted that she had a euthymic to perhaps minimally depressed affect. (R. 410).

Also in December 2001, Robert L. Muller, Ph.D., diagnosed the Plaintiff with a dysthymic disorder and a major depressive disorder with psychotic features, single episode, full remission. (R. 330-333). He also indicated that she had moderate limitation in her ability to carry out detailed instructions, moderate limitation to respond appropriately to work pressure in a usual work setting, and slight limitation in her ability to respond appropriately to changes in a routine work setting. (R. 332-333).

In April 2002, Dr. Silver completed a mental limitation assessment and indicated that the Plaintiff had four moderate limitations, three marked limitations, and five extreme limitations in seventeen of the work-related abilities.

The Plaintiff began receiving treatment for depression at the University of Virginia in April 2002. Sheryl Johnson, M.D., noted that her depression seemed to be in remission. In August 2002 her mood was stable, but it soon worsened. On August 29, 2002, Akindele Kolade, M.D., changed her diagnosis from major depressive order, full remission, to major depressive

5

disorder, in partial remission, and in November 2002 he noted that the Plaintiff had a disheveled appearance and a dysphoric mood.

## II. The ALJ's Opinion

The ALJ denied the Plaintiff's claims on August 22, 2003. With regard to her claim of disability due to the peripheral neuropathy, the ALJ found that the Plaintiff had a peripheral neuropathy which limited her to the performance of "no more than sedentary exertion level work that allows the individual to work while standing or work while sitting and to alternate between those two positions as needed for comfort." (R. 22). However, the ALJ went on to find that she retained the residual functional capacity to perform jobs existing in significant numbers in the national economy, even though she did not have the RFC to perform the full range of sedentary work.

In arriving at this conclusion, the ALJ relied heavily on the testimony of Haddon Alexander III, M.D., the independent expert physician. At the hearing, Dr. Alexander testified that the record did not contain documentation which would allow him to say that the peripheral neuropathy met a listing level. He went on to note that he thought that the Plaintiff's level of functioning due to the neuropathy was "largely subjective," although it had been "deemed credible" by her examining physicians due to the fact that they prescribed her "heavy-duty" medication. (R. 582). Dr. Alexander also testified that he did not find any explanation in the record which would connect the Plaintiff's chemotherapy and the peripheral neuropathy. Nor did he find that the record contained documentation for why the Plaintiff needed to elevate her leg. (R. 583) Instead, he characterized her need to elevate her leg as a subjective limitation, opining that "it apparently has come into being in the management, that the claimant is more comfortable

6

with it elevated than with it on the floor, for whatever reason." (R. 583).

The ALJ agreed with Dr. Alexander's characterization of the Plaintiff's need to elevate her leg as something done for comfort and found this consistent with other medical opinions. For instance, he acknowledged that Dr. Barrish concluded that the Plaintiff's ability to work would be "especially facilitated" by a job that would allow her to occasionally elevate her leg, but went on to note that there was no *requirement* that the Plaintiff be able to lift her leg. (R. 27). Thus, the ALJ concluded again that the Plaintiff's need to elevate her leg was only a "subjective factor." (R. 27). He also noted that even though Dr. Plews-Ogan stated that the Plaintiff needed to elevate her leg, this was no more than a subjective limitation because of the lack of adequate documentary support for this requirement. According to the ALJ, Dr. Plews-Ogan does not support her statements about the claimant's need to elevate her leg with anything more than subjective reports, which does not make her report objective evidence. *See Craig v. Chater*, 76 F.3d 585, 590 n2 (4th Cir. 1996). The ALJ similarly discounted the weight of Dr. Bishop's notation that the Plaintiff needed to keep her leg elevated, characterizing this statement as simply Dr. Bishop's reporting of what the Plaintiff had told her. (R. 28). The ALJ concluded that Dr. Bishop distanced her professional opinion from those of the Plaintiff when she stated that she had "no way of knowing how well she will tolerate the training." (R. 27).

Finally, the ALJ gave the Plaintiff's allegations only partial credit, finding that they were not supported by the evidence in the record and were internally inconsistent. Specifically, the ALJ did not credit the allegation that the Plaintiff was able to "drive a car and tend to the many household chores she performs, but unable to work at simple tasks on a sustained, regular and continuing basis." (R. 29).

7

With regard to the Plaintiff's claim of disability due to depression, the ALJ found that the Plaintiff did have a depressive disorder only rising to the level of a non-severe impairment. The ALJ also found that her depression has responded well to treatment, basing this finding on the fact that the UVA record of July 11, 2002 indicates that the claimant "reports significant improvement" and is "doing well." (R. 23). The ALJ characterized this evidence as the last evidence in the record from UVA, when in fact the record contains reports from UVA after that date. (See R. 458, 451, and 446).

## III. Discussion

Review of a final decision of the SSA concerning disability benefits pursuant to 42 U.S.C. § 405(g) is limited to two determinations: (1) whether the SSA's findings of fact are supported by substantial evidence; and (2) whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Hays, 907 F.2d at 1456. Thus, the Court must not review the factual findings of the Commissioner *de novo* by weighing evidence or substituting its own judgment for that of the Commissioner, so long as the Commissioner's decision is supported by substantial evidence. *Id.*

The Plaintiff argues that the ALJ's decision should be reversed because it improperly rejected the evidence offered by her treating physicians with respect to the need to elevate her leg; ignored evidence in the record and rejected the opinions of her treating physicians in order to

8

find that she did not suffer a severe mental impairment; improperly rejected the opinion of the vocational expert regarding the ability of a claimant with certain limitations to do jobs identified in the ALJ's hypothetical; and improperly discredited the Plaintiff's testimony.

Having thoroughly reviewed the matter, the Court agrees with the Plaintiff that the ALJ's determination as to the Plaintiff's ability to return to work despite her peripheral neuropathy is not supported by substantial evidence. Specifically, the Court finds that there is not substantial evidence supporting the finding that there is no objective medical reason for the Plaintiff to elevate her leg during work. The ALJ relied heavily on Dr. Alexander's testimony that he could not find any documentation for the elevation requirement and that such a requirement was merely a subjective limitation concerned only with the Plaintiff's comfort level. However, this testimony does not provide substantial support for the ALJ's determination for a number of reasons. First, Dr. Alexander did not state that there was no medical need for the elevation requirement, only that he did not find the documentation to support such a requirement. Moreover, despite his inability to find documentation for the requirement, he did find that the Plaintiff's level of functioning due to the neuropathy was deemed credible by virtue of the strong medications prescribed by her treating physicians. That being the case, the ALJ erred in finding that "the persuasive medical opinions in the record indicate that the objective evidence does not establish the existence of a medical impairment expected to cause the degree of pain and limitation that the claimant alleges." (R. 29).

Also, the Court finds Dr. Alexander's characterization of leg elevation as a subjective limitation to be at odds with the medical opinion he reviews. What Dr. Alexander minimizes as something done for comfort is none other than a practice perfectly consistent with the treatment

9

Case 3:05-cv-00016-NKM-BWC  Document 17  Filed 02/10/06  Page 9 of 12  Pageid#: 137

of the Plaintiff's chronic pain. This is especially true where the prescribed medications have, in Dr. Alexander's own opinion, failed to achieve maximum continual benefit. It is also worth noting that Dr. Barrish did provide a medical reason for the Plaintiff's leg elevation: "to reduce the amount of edema and swelling." (R. 326). Thus, the Court finds that Dr. Alexander's testimony - namely, that the Plaintiff's pain and functioning have been deemed credible and that leg elevation is done because her medications have not fully worked - does not provide substantial evidence for the conclusion that leg elevation is merely a subjective limitation rather than a medical requirement.

The Court also finds that the ALJ's opinion as to the non-severe nature of the Plaintiff's depressive disorder is not supported by substantial evidence. As noted above, the ALJ found that the Plaintiff did not have a severe depressive disorder because, in what the ALJ erroneously considered the Plaintiff's last UVA record regarding depression, she reported significant improvement in her depression. (R. 23). This conclusion, however, is not supported by substantial evidence for two reasons. First, the July 11, 2002 record cited by the ALJ was in fact not the last UVA record in evidence. As the Plaintiff has pointed out, she continued to visit UVA for her depression after this visit, during which time her depression worsened. On August 29, 2002, for example, Dr. Kolade changed her diagnosis from major depressive disorder, full remission, to major depressive disorder, in partial remission. (R. 458). Also, in November 2002, the Plaintiff's depression had worsened, resulting in her having a disheveled appearance and dysphroic mood according to Dr. Kolade. (R. 446). The second, and perhaps more significant way in which the ALJ's reasoning is not supported by substantial evidence is the manner in which it ignores the documented fluctuation in the severity of the Plaintiff's depression. (See.

10

Pl.s Memorandum at 19, citing R. 193-194, 373-397, 410, 413-414, 446, 451, 458, 504; see also R. 428-429). As the Plaintiff's history of ups and downs shows, it is hardly surprising that on one particular visit she might report feeling significantly better. Pointing to one such occasion, moreover, does not provide substantial evidence for the conclusion that the Plaintiff's depressive disorder is not severe, especially when that visit is followed by others in which the depression has returned.

The next issue concerns which matters remain to be addressed upon remand. Judge Crigler found in his R&R that the vocational expert foreclosed the possibility that there were other jobs for her in the national economy. Thus, he recommended that this Court remand the case solely for the purposes of calculating and paying proper benefits. However, the Court does not agree that the VE foreclosed the possibility of other jobs existing for the Plaintiff. Dr. Barrish and Dr. Plews-Ogan stated that the Plaintiff needed to elevate her leg "periodically" or "occaisionally." The VE said that whether the Plaintiff could find work depended on what "periodically" meant. If she only had to elevate it during a morning break, during lunch, and during an afternoon break, then there would be jobs available in the VE's estimation. But if the Plaintiff had to move off task to raise her leg more often than that then there probably would not be jobs that she could do. (R. 590-591).

As noted above, the ALJ found that the Plaintiff could work standing or walking for two hours in an eight hour day, and could sit at least six hours in an eight hour workday. (R. 29). He found that she needed a job which allowed her the freedom to alternate between standing and sitting, but made no finding that she needed to be able to lift her leg. (R. 29). Based on these findings, the ALJ found that there were jobs available for the Plaintiff. Because the Court does

11

not find substantial evidence to support the ALJ's determination that the Plaintiff did not need to elevate her leg, the proper course of action is to remand this matter so that the ALJ can decide how often she needs to elevate her leg and, consequently, whether there are jobs available for her.

Upon remand, the ALJ must also reconsider his decision regarding the Plaintiff's depressive disorder by taking into consideration all of her records from UVA, including those from after July 11, 2002.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion to all counsel of record and to Magistrate Crigler.

ENTERED: *[signature]*
United States District Judge

Date: February 10, 2006